**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
|     LIANA MIREA | ) | Case No. 11-11266-BFK |
| | ) | Chapter 7 |
|               Debtor | ) | |
| | ) | |
| GEORGE NICOLAE | ) | |
| | ) | |
|               Plaintiff | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 11-01294 |
| | ) | |
| LIANA MIREA | ) | |
| | ) | NOT FOR PUBLICATION IN |
|               Defendant | ) | WEST'S BANKRUPTCY REPORTER |

**MEMORANDUM OPINION**

This matter came before the Court for a trial on the merits on July 9 and 10, 2012. The Plaintiff represented himself, *pro se*. The Defendant was present, and was represented by counsel. For the reasons stated below, the Court will: (a) dismiss the Plaintiff's fraud-based claims under Section 523(a)(2)(A) (Count I); and (b) declare the Debtor's obligation to pay the mortgage, real estate taxes, and insurance on the marital residence to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(5) (Count II).

**Findings of Fact**

The Court, having heard the testimony of the witnesses, and having reviewed the evidence, makes the following findings of fact:

1. The Debtor and Mr. Nicolae were married in 1992. Mr. Nicolae is a chemist, with a Ph.D. in chemistry. The Debtor holds a real estate broker's license. She also has, or had, a Series 7 securities license. They are both originally from Romania.

2. Before they were married, the parties entered into a Pre-Nuptial Agreement. Plaintiff's Exh. 21.

3. The parties are separated, and are going through a divorce proceeding in Chicago, Illinois, where they resided for many years.

4. The parties jointly own the marital residence located in Medinah, Illinois.

### The July 2004 Mortgage Loan

5. On July 16, 2004, the parties took out a second mortgage on their residence, in the amount of $100,000, from First Suburban National Bank. Plaintiff's Exh. 38. The purpose of the loan was to fund the start-up costs of a new commercial real estate brokerage business of the Debtor, known as American Commercial Real Estate, Inc. ("ACRE").

6. Mr. Nicolae did not want to use the marital residence to finance the Debtor's new business venture, preferring to keep business and private matters separate. However, at the end of the day, he acknowledged that the signature on the Mortgage was his signature. *Id*. at p. 12.

### The August 2005 Refinance

7. On or about August 5, 2005, the parties refinanced the debt on their marital residence. Plaintiff's Exh. 4.

8. This transaction included the payment of $136,833.56 to First Suburban National Bank. *Id*. at p. 1, Line 105 (HUD-1 Settlement Statement). This amount was used to pay off the loan to First Suburban that the Debtor had incurred to start up ACRE.

9. Mr. Nicolae acknowledged that the signature on this Mortgage was his signature. *Id.* at p. 80.

### The CitiBank Home Equity Line of Credit

10. Later that same month, on August 26, 2005, the Debtor opened a Home Equity Line of Credit with CitiBank, in the amount of $82,000. Plaintiff's Exhs. 15, 32. The marital residence also was used as collateral for this line of credit. *Id.*

11. Again, Mr. Nicolae was reluctant to agree to this line of credit. However, he acknowledged that the signature on the Mortgage was his signature. Plaintiff's Exh. 32, p. 3.

12. The Debtor testified that she used the loan proceeds of the CitiBank line of credit for both business and personal expenses.

### The Sale of the Commercial Building and the Three Checks to the Debtor

13. In early 2006, Mr. Nicolae sold a commercial building in the Chicago area that he owned separate and apart from his wife. The Debtor acted as Mr. Nicolae's real estate broker, and received a commission in the amount of $72,000.

14. Subsequent to the sale, Mr. Nicolae gave his wife three checks, as follows:

| Check No. | Date | Amount | Memo Line |
|---|---|---|---|
| 1273 | 1/19/2006 | $24,000 | Pay Line Credit[1] |
| 1284 | 2/15/2006 | $50,000 | Loan |
| 1285 | 2/16/2006 | $25,000 | Loan |

11. The Plaintiff and the Defendant disputed the purpose of these three checks at the trial. Mr. Nicolae testified that he gave the checks to his wife for the express purpose of paying down the mortgages on the marital property. The Debtor, on the other hand, testified that these

---

[1] The Debtor acknowledges writing this on the Memo portion of this check. *See* Plaintiff's Exh. 20.

3

checks represented an additional commission to which she and her husband had agreed for the sale of the commercial building. The parties agreed that the Debtor used the $50,000 check to pay down the CitiBank line of credit.

## The Divorce Proceedings in Chicago

12. As noted, the parties are involved in divorce proceedings in Chicago.

13. In July 2010, the Debtor wanted to refinance the marital property. Mr. Nicolae signed the refinance papers, but later rescinded his signature within the three-day rescission period.

14. The Debtor filed an emergency Motion with the DuPage County Circuit Court in the parties' divorce case to compel Mr. Nicolae to sign the refinance papers, and not to rescind his signature.

15. After some hallway negotiations, the parties entered into an Agreed Order, which was entered by the Court that same day, July 16, 2010. Plaintiff's Exh. 55. The Agreed Order provides, in part, as follows:

> 2. Both parties shall execute the Loan Modification Agreement for the marital residence.
>
> 3. The parties shall maintain the status quo whereby the Plaintiff, Liana Mirea (Liana), shall be responsible for and pay the mortgage, real estate taxes and homeowner's insurance for the marital residence without prejudice and until further order of Court.

*Id.*

16. The property was subsequently refinanced with a HAMP loan modification, in August 2010. Plaintiff's Exhibit 53.

17. The Debtor made the monthly mortgage payments through September 2010, and the mortgage has been in default ever since. The lender has obtained relief from stay in this

bankruptcy case, and has noticed the property for a foreclosure. Case No. 11-11266, Docket No. 20.

## Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and the Order of Reference of the U.S. District Court for the Eastern District of Virginia dated August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I) (determination as to the dischargeability of particular debts).

The Plaintiff bears the burden of proof on all issues under Section 523 of the Bankruptcy Code. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755, 767 (1991). The standard of proof is a preponderance of the evidence. *Id.*

### I.    The Plaintiff's Motion to Amend.

At the outset, it is important to identify what is, and what is not, at issue in this adversary proceeding. On June 2, 2011, the Plaintiff, Mr. Nicolae, acting *pro se*, sent a letter to the Court, objecting to the Debtor's discharge under Section 727 of the Bankruptcy Code, and requested that certain debts owed to him be excepted from the Debtor's discharge under Section 523 of the Code. Docket No. 1. This was treated by the Court as a Complaint Objecting to the Debtor's Discharge, and to Determine the Dischargeability of Debts.

The Debtor later engaged counsel. On August 4, 2011, the Plaintiff, through his counsel, filed an Amended Complaint. Docket No. 15. The Amended Complaint included only two counts – a count under Section 523(a)(2)(A) (Count I), and a count under Section 523(a)(5) (Count II). The Amended Complaint did not purport to state any claims under Section 727 of the Bankruptcy Code, in effect abandoning any objection to the Debtor's discharge under that

5

Section.  Counsel for the Plaintiff was granted leave to withdraw from the case on February 7, 2012.  Docket No. 34.

One week before the trial, on July 2, 2012, the Plaintiff filed his Exhibit List, together with a pleading entitled "Plaintiff's Presentation for the Final Trial," essentially a trial brief.  Docket No. 72.  In his trial brief, the Plaintiff argued that he had claims under Sections 523(a)(2)(A), 523(a)(2)(B), 523(a)(4) and 523(a)(6), as well as claims under Sections 727(a)(3), 727(a)(4)(A) and (B), and 727(a)(6)(A), of the Bankruptcy Code.  At the trial, the Court ruled that, regardless of whether the Section 727 claims stated in the Plaintiff's initial letter pleading (Docket No. 1) could be resurrected as a matter of law, the attempt to state new claims under Sections 523(a)(2)(B), 523(a)(4) and 523(a)(6), and to renew the Section 727 claims, all on the eve of trial, constituted unfair surprise and were prejudicial to the Defendant.  Treating the Plaintiff's trial brief as a Motion to Amend the Amended Complaint, the Court denied the Motion to Amend on the basis of unfair surprise and prejudice to the Defendant.  *See Foman v. Davis*, 371 U.S. 178 (1962); *Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 482-83 (4th Cir. 1992).

Accordingly, the Court will address only the claims stated in the Amended Complaint, not the claims that the Plaintiff attempted to assert in his trial brief under Sections 523(a)(2)(B), 523(a)(4), 523(a)(6), 727(a)(3), 727(a)(4)(A) and (B), and 727(a)(6), of the Bankruptcy Code.

**II.     The Plaintiff's Section 523(a)(2)(A) Claims.**

In order to prevail on a claim of actual fraud under Section 523(a)(2)(A), the Plaintiff must prove four elements: "(1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation."  *Foley & Lardner v. Biondo (In re Biondo),* 180 F.3d 126, 134 (4th Cir.

1999). In *Field v. Mans*, the Supreme Court held that the standard for reliance under Section 523(a)(2)(A) is "justifiable reliance," meaning something less exacting than the standard of "reasonable reliance." 516 U.S. 59, 74-75, 116 S.Ct. 437, 446, 133 L.Ed.2d 351, 365 (1995).

The Court will address each of Mr. Nicolae's Section 523(a)(2)(A) claims separately.

*A. The Borrowings Against the Marital Residence and the Refinancing.*

Boiled down to its essence, the Plaintiff claims that he was duped in connection with: (a) the July 2004 borrowing of $100,000, secured by the marital residence, for the start-up costs of his wife's business, ACRE; (b) the August 5, 2005, refinance of the marital residence mortgage debt (which included the payoff of the ACRE-related financing, in the amount of $136,833.56, to First Suburban National Bank); and (c) the August 26, 2005, CitiBank Home Equity Line of Credit, in the amount of $82,000. In each case, the Plaintiff acknowledged that the signatures on the mortgage documents were his. In each case, though, he testified that he did not understand what he was signing, and that he was misled into signing the mortgage documents.

The Plaintiff spent very little time at trial testifying as to the initial, 2004 mortgage, in the amount of $100,000, which was used to finance ACRE's start-up costs. He did, however, testify that he always wanted to keep his and his wife's business matters separate from their personal finances, and that he did not think it was a good idea to put their home at risk for the ACRE business. In hindsight, he was right; it was not a good idea to put the home at risk for this business. By 2008, the business, like many commercial real estate businesses, was failing, and by 2009, it was shut down and completely out of business. However, this is true of many businesses, and it is also true of many individuals who put up their residences as collateral for business loans. In hindsight, this may have been a bad decision, but this does not amount to a fraudulent inducement to sign the loan documents on the Debtor's part.

Mr. Nicolae further testified that, in each case, his wife told him that he was not "on the title," i.e., that he would not be personally liable for the ACRE borrowing, and that he would not be personally liable for the CitiBank line of credit in the amount of $82,000.[2] In a strict sense, this was true – Mr. Nicolae was not personally liable for the ACRE loan, nor was he liable for the CitiBank line of credit. However, what he may not have understood fully at the time that he signed the mortgages was that he was putting his home at risk, both for the ACRE loan from Suburban Federal, and for the CitiBank home equity line.

The Court fully credits Mr. Nicolae's testimony that he was a chemist, that he was not as financially sophisticated as his wife, and that he trusted his wife to handle the real estate and financial matters for the family. At the same time, Mr. Nicolae, who is intelligent and well spoken (even accounting for the fact that English is not his native language), must have understood that he was signing *something* of importance when he signed the mortgage documents on each occasion. Otherwise, if his signatures on the mortgages were meaningless, the title companies and mortgage lenders would not have bothered to ask him to sign.

The Court finds that Mr. Nicolae has not met his burden of proof in proving that he was fraudulently mislead into signing any of the mortgage documents on his home, for the 2004 borrowing, the August 5, 2005, refinance, and the August 26, 2005, CitiBank line of credit. Further, the Court finds that Mr. Nicolae has not proven that he justifiably relied on the Debtor's representations at the time he signed the mortgage documents. A person of ordinary intelligence (which Mr. Nicolae exceeds) would have understood that he was putting his home at risk for these borrowings. These claims will be dismissed.

---

[2] The Court understands Mr. Nicolae's references to "not being on the title" to mean that he would not be personally liable for the obligations. He clearly did not mean that he was not on the title in the way that lawyers and judges commonly understand this phrase – this was his home, and he always understood that he had legal ownership of the property, along with his wife.

*B. The Three Checks Payable to the Debtor.*

Following the sale of the commercial building (for which the Debtor received a $72,000 real estate commission), Mr. Nicolae gave his wife three checks, in the amounts of $24,000, $25,000 and $50,000. Mr. Nicolae asserts that he gave these checks to his wife for the express purpose of paying down the mortgages on the marital residence. The Debtor denies that she received the funds for this purpose. However, the parties agree that the $50,000 check was used to pay down the CitiBank home equity line of credit. Thus, Mr. Nicolae benefitted from the use of the $50,000, and cannot claim any damages therefrom.

Mr. Nicolae claims that the other two checks were given to his wife in order to pay down the mortgage on the marital residence. However, the Court cannot make this finding. The $25,000 check has the notation "Loan" in the Memo line, which was acknowledged to be Mr. Nicolae's handwriting (the same notation that was made on the $50,000 check). The $24,000 check has "Pay Line Credit" in the Memo line, but this was not written by Mr. Nicolae before he delivered it to his wife; rather, the Debtor wrote this in the Memo line after receipt of the check.

The Court asked Mr. Nicolae why he didn't just pay the mortgage himself by writing checks directly to the mortgage lender, as opposed to delivering the checks to his wife. He testified that his wife handled the business matters for the family, and that he trusted her to pay the mortgages in these amounts. However, even assuming that the Debtor handled the business matters for the family, there is still no reason why Mr. Nicolae could not have mailed the checks to the mortgagee, a fairly simply task of which he was clearly capable.

There are no notes, memos, e-mails, or other contemporaneous documents that would shed any light on the purpose for which these funds were provided to the Debtor. Mr. Nicolae

9

has failed to carry his burden of proof that he was defrauded into giving his wife these three checks. These claims will be dismissed.[3]

### III.    The Plaintiff's Section 523(a)(5) Claim.

Finally, the Plaintiff claims that the Debtor's obligation to pay the mortgage and related expenses (real estate taxes and insurance) are non-dischargeable pursuant to 11 U.S.C. § 523(a)(5). The Court agrees.

The Debtor's obligation to pay stems from the State Court Order of July 16, 2010. Plaintiff's Exhibit 55. The Order required the Debtor to pay as follows:

> 3. The parties shall maintain the status quo whereby the Plaintiff, Liana Mirea (Liana), shall be responsible for and pay the mortgage, real estate taxes and homeowner's insurance for the marital residence without prejudice and until further order of Court.

*Id.*

The question is whether this is a domestic support obligation under Section 523(a)(5). Section 101(14A) defines the term "domestic support obligation" as follows:

> The term "domestic support obligation" means a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is—
>
> (A) owed to or recoverable by—
>
>   (i)  a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
>
>   (ii) a governmental unit;
>
> (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;

---

[3] Similarly, the Plaintiff's evidence fails to support any claim that the Debtor was entrusted with these funds for a specific purpose, under Section 523(a)(4) of the Code.

10

    (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of—

        (i) a separation agreement, divorce decree, or property settlement agreement;

        (ii) an order of a court of record; or

        (iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and

    (D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

11 U.S.C. § 101(14A).

Whether the obligation is in the nature of alimony, maintenance or support depends on the intent of the parties. *Tilley v. Jessee*, 789 F.2d 1074, 1078 (4th Cir. 1986); *Brunson v. Austin (In re Austin)*, 271 B.R. 97, 105 (Bankr. E.D. Va. 2001); *In re Crosby*, 229 B.R. 679, 681 (Bankr. E.D. Va. 1998). In making this determination, the Court will look to the following factors: (1) the language and substance of the agreement; (2) the financial situation of the parties at the time of the agreement; (3) the function served by the obligation at the time of the agreement; and (4) whether there is any evidence of overbearing at the time of the agreement. *See In re Pagels*, Adv. No. 10-07070-SCS, 2011 WL 577337, at *10 (Bankr. E.D. Va. Feb. 9, 2011); *Catron v. Catron (In re Catron)*, 164 B.R. 912, 919 (E.D. Va. 1994), aff'd 43 F.3d 1465 (4th Cir. 1994); *Kettner v. Kettner*, No. 91-587-N, 1991 U.S. Dist. LEXIS 21130 (E.D. Va. Nov. 19, 1991). "The objecting spouse bears the burden of proving that the claim is 'actually in the nature of alimony, maintenance or support.'" *In re Pagels*, Adv. No. 10-07070-SCS, 2011 WL

577337, at *9 (Bankr. E.D. Va. Feb. 9, 2011) (quoting *Tilley v. Jessee*, 789 F.2d 1074, 1077 (4th Cir. 1986)).[4]

Turning to the first factor, the language and the substance of the Order, the Order plainly requires the Debtor to pay for the mortgage, real estate taxes, and insurance, which were continuing monthly obligations of the parties. The Order was the product of negotiation between the parties. The language of the Order supports the conclusion that this obligation is in the nature of alimony, maintenance, or support.

With respect to the second factor, the financial situation of the parties at the time of the agreement, the Court finds that the parties were of roughly equal financial status and bargaining power at the time of the Order.

The Court finds the third factor to be the most probative here. In *In re Catron*, the Court quoted *Kettner* as follows:

> An agreement that serves to provide such daily necessities as food, clothing, shelter, and transportation is indicative of debt intended to be in the nature of support. . . .

*Catron*, 164 B.R. at 919 (quoting *Kettner v. Kettner*, No. 91-587-N, 1991 U.S. Dist. LEXIS 21130, at *4-5 (E.D. Va. Nov. 19, 1991)).

Here, the Order required the Debtor to pay the mortgage, real estate taxes, and insurance for the property where the Plaintiff resided at the time, and still resides. This is an Order providing for the payment of the mortgage and related expenses on the Plaintiff's residence. Further, the Court notes that on an interim, or *pendent lite,* basis, the State Court could only award maintenance as opposed to property settlement (other than the entry of a temporary

---

[4] Although most of these cases – specifically, *Tilley, Catron, Kettner* – preceded the 2005 BAPCPA Amendments to the Code, which introduced the concept of "domestic support obligations," these cases remain relevant to a determination of whether an obligation is in the nature of alimony, maintenance or support. Bankruptcy Code Section 101(14A)(B) still requires the Court to determine whether the obligations are "in the nature of alimony, maintenance, or support," for purposes of determining whether or not they are domestic support obligations.

injunction to preserve the status quo).  *See* 750 Illinois Compiled Statutes § 5/501 (Temporary Relief); 750 Illinois Compiled Statutes §5/504 (Maintenance) ("the Court may grant a temporary or permanent maintenance award for either spouse").

With respect to the fourth factor, the Court finds that there is no evidence of overbearing conduct on either party's part.  The Debtor was represented by counsel at the time the Order was entered.  If anything, the testimony supports the Plaintiff's position that he felt browbeaten into acceding to the Order.

The Debtor objects to the Plaintiff's claim of non-dischargeability, asserting that this is an interlocutory Order of the State Court.  Plaintiff's Exhibit 55 ("…without prejudice until further order of court").  However, Section 101(14A), in defining a domestic support obligation, by its terms, makes no distinction between interim and final orders.  It simply states: "an order of a court of record."  11 U.S.C. § 101(14A)(C)(ii).  Had Congress intended to exempt, wholesale, *pendent lite* support orders from the operation of Section 523(a)(5), it would have said so in more clear terms.  Moreover, Courts that have been presented with the issue have held that *pendent lite* support Orders are non-dischargeable.  *See*, *i.e., In re Bonito*, No. 09-31888, 2010 WL 3398396 (Bankr. D. Conn. Aug. 26, 2010) (*pendent lite* Order requiring Debtor to pay mortgage was a domestic support obligation); *In re Schenkein*, Adv. No. 09-01947, 2010 WL 3219464 (Bankr. S.D.N.Y. Aug. 9, 2010) (*pendent lite* support found to be non-dischargeable).  The State Court Order at issue in this case is not exempt from consideration under 11 U.S.C. § 523(a)(5) simply because it is an interim Order.

The Debtor also claims that the parties have a Prenuptial Agreement that precludes an award of spousal support.  This is true.  *See* Plaintiff's Exhibit 21, Art. 3, ¶ 5 ("To the extent permitted by law, maintenance is waived by both parties, and if not permitted by law, permitted

13

to the legal minimum"). However, the Court concludes that the Debtor waived this provision when she sought, and entered into, the Order of July 16, 2010.

Finally, the Court notes that this is a Chapter 7 case. If the obligations arising out of the State Court Order are not in the nature of alimony, maintenance, or support, they would still be non-dischargeable under Section 523(a)(15) of the Bankruptcy Code, which excepts debts:

> to a spouse, former spouse, or child of the debtor and not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, or a determination made in accordance with State or territorial law by a governmental unit.

11 U.S.C. § 523(a)(15).

The obligation to pay the mortgage, real estate taxes, and insurance payments is an obligation that arises out of an order of a court of record, in connection with the parties' divorce or separation. It was "incurred by the debtor in the course of a divorce or separation," and it is the product of an "order of a court of record," under Section 523(a)(15). The result in this case would be the same under Section 523(a)(15). *See In re Rogowski,* 462 B.R. 435, 440 n.9 (Bankr. E.D.N.Y. 2011) ("[I]t is irrelevant whether those awards constitute true support obligations, because even if not encompassed within § 523(a)(5), they would be nondischargeable pursuant to § 523(a)(15)" (citing *In re Tarone*, 434 B.R. 41, 49 (Bankr. E.D.N.Y. 2010))).

The Court will enter an Order declaring the obligations arising out of the Order of July 16, 2010, to be non-dischargeable, pursuant to 11 U.S.C. § 523(a)(5).

**Conclusion**

For the foregoing reasons, the Court will: (a) deny the Plaintiff's Motion to Amend; (b) dismiss the Plaintiff's claims under Count I of the Amended Complaint (11 U.S.C. § 523(a)(2)(A)); and (c) declare the Debtor's obligations under the State Court Order of July 16,

2010, to pay the mortgage, real estate taxes, and insurance, from October 1, 2010, until a sale or foreclosure of the property, to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(5). A separate Order shall issue.

Date: _____

Brian F. Kenney
United States Bankruptcy Judge

Copies to:

George Nicolae
PO Box 435
Medinah, IL 60157-0435
Plaintiff

Liana Mirea
1121 N. Arlington Blvd.
Suite N 447
Arlington, VA 22209
Defendant

Nora Raum, Esquire
2007 North 15th Street Suite 201
Arlington, VA 22201
Counsel for the Defendant